Filed 8/26/25  P. v. Rivas CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D085099 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE419866) |
| RENE MARTINEZ RIVAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Herbert J. Exarhos, Judge.  Affirmed.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

A jury convicted Rene Martinez Rivas of continuous sexual abuse of Melanie R., a child under 14 years of age.  (Pen. Code, § 288.5, subd. (a).)  The jury also found true that, in committing the offense, Rivas (1) used force, violence, duress, menace, or fear of immediate and unlawful bodily injury on her or another person (§ 1203.066(a)(1)); and (2) had substantial sexual contact with a child under 14 years of age (§ 1203.066(a)(8)).  Appointed

appellate counsel filed a brief under *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 indicating she found no arguable issues for reversal on appeal.  Counsel asks us to review the record for error as *Wende* requires.  We offered Rivas the opportunity to file his own brief, but he has not done so.

Based on our independent review of the record, we find no reasonably arguable appellate issues.  We thus affirm.

## I.

Melanie was born in October 2004.  Her older sister was married to Rivas.  Melanie's sister and Rivas had two children younger than Melanie.

## A.

According to Melanie, shortly before she turned 12 years old in 2016, Rivas babysat her once or twice a week in the evening when Melanie's sister and mother were both working.

Rivas' "contact with [Melanie] start[ed] to change" when he took a shower while babysitting and called to Melanie to pass him a towel.  He opened the door naked and told Melanie "it's okay" if she "saw him."  Melanie felt very uncomfortable because she "knew it wasn't right."

A week or two later, when Melanie was 12, Rivas suggested they play "a choices type-of-game," starting with picking between turning off her phone or drinking a cup of water "super quick."

"But [the game] escalated" and took on a sexual nature.  Rivas asked if Melanie would rather remove a piece of her clothing or have him take off a piece of his clothing.  She felt "[u]ncomfortable" and "fearful," and chose Rivas taking off a piece of clothing because the other choice would make her feel "more vulnerable."  He took off his shirt.

2

Eventually Rivas asked if Melanie would rather wear her underwear and sit on his naked lap or take off her underwear and sit on his lap while he wore boxers. Melanie chose to keep her underwear on, so they went into the bathroom, he sat on the toilet, they removed the relevant garments, and he grabbed her by the waist and put her on his lap for "20, 30 seconds." Rivas continued to hold her waist and breathed heavily. Melanie could feel his erect penis rubbing her buttocks. She felt vulnerable and "a little scared." Afterwards, Rivas told Melanie "to just keep it a secret."

The next incident Melanie recalled was when Rivas gave her a choice between him touching her vagina or her masturbating him in the shower. She chose the latter option, and he taught her how to masturbate him. She saw Rivas ejaculate.

Rivas played these sexual "games" with Melanie tens of times over a period of years. The "choices" with which Rivas presented Melanie resulted in the two of them removing clothing or touching each other, including Rivas touching Melanie's breasts and her vagina—one time rubbing her "clit area" for "20 or 30 seconds." Melanie "felt very uncomfortable" and was "scared that it would get worse."

In the spring of 2017, Rivas and his family moved into Melanie's mother's apartment, during which time he had Melanie touch his penis "[a]t least seven" times. During those times, she would masturbate Rivas, and he ejaculated "[i]f not all, most of those times."

Toward the end of the time Rivas was living in Melanie's home, he gave her the choice between giving him "a blow job" or having sex with him after she turned 18. She decided she would prefer to perform oral sex because "the idea of sleeping with him was horrible." When Melanie refused to open her

3

mouth as Rivas told her to, he used both hands to grab her shoulders and get closer. Melanie felt scared and "kind of like, just ran away."

Melanie also recalled a time after that incident when Rivas showed her a pornographic video on his phone of a girl masturbating, took off most of his clothes, "nudg[ed]" Melanie to masturbate him, and touched her vagina under her underwear. This lasted about five minutes, until the video ended "and he finished."

Even after Melanie's sister, Rivas, and their children moved out of Melanie's mother's apartment, Rivas either touched Melanie's breasts or forced her to touch his penis another four or five times.

In total, Melanie estimated Rivas touched her "over 20, 30 times" before she turned 14 years old.

Rivas would tell Melanie it was "okay" if she did not want to play the games anymore because "he could always just . . . find it elsewhere," which she interpreted to mean "with [her] niece and nephew." He also told Melanie she should not tell anyone about the game because "who knows how" Melanie's mother, who had health issues, "could take it." In addition, he said Melanie's sister may "blow it out of proportion and do something stupid in the heat of the moment." Melanie felt she could not talk to her mother or sister as a result and also felt "ashamed."

In 2020, when Melanie was 15 years old, she recorded a video of Rivas when he was giving her a ride home. In the video, Rivas tells Melanie she could "win a thousand dollars" if, "by the time [he] g[o]t from here to [her] house, . . . a squirt comes out." He told her she did not "have to do anything" because he would "do it." Melanie said she would "rather not. It's wrong," to which he replied, "I know it is." She reminded Rivas he was her "sister's

4

husband" and she was a minor, and he replied, "I know." The video was played for the jury at trial.

## B.

The first person Melanie told about Rivas' abuse was her sister. About a year and a half before the 2024 trial, Melanie's sister asked her why she did not like Rivas, who by then was separated from the sister. She asked Melanie "if he ever did something," and Melanie responded to her sister's yes or no questions. The next day, Melanie disclosed the abuse to law enforcement.

Afterwards, Melanie also told her mother that Rivas had sexually abused her.

## C.

Rivas testified on his own behalf. He denied any knowledge of the incidents of abuse to which Melanie testified. He denied ever babysitting Melanie.

As to the video, Rivas testified Melanie threatened him and told him what to say before she started recording. She told him she "kn[e]w how to kill people and how to get rid of the evidence." He claimed the statements he made in the video were not true.

According to Rivas, he witnessed Melanie's mother and sister make false accusations that his stepbrother sexually abused Melanie as well. The court denied the defense's request to present this testimony through Rivas' brother as inadmissible hearsay.

## D.

The jury convicted Rivas of the sole charged count and also found true both allegations.

5

Rivas requested the low-term sentence of six years in prison based on numerous mitigating factors.  Rivas submitted letters from family members and others on his behalf.  The People sought a middle-term sentence of 12 years, arguing several aggravating circumstances applied but no mitigating circumstances.  Probation also recommended a 12-year middle-term sentence.

The court found Rivas' significant employment history and lack of prior criminal history were mitigating factors but were outweighed by the length of time over which the abuse occurred and the number of abusive acts.  The court therefore imposed the middle term of 12 years.  The court reserved on restitution and awarded 33 days of actual credit and four days of conduct credit for 37 total days of credit.

## II.

Rivas' counsel filed a *Wende* brief setting forth a statement of the case and facts, urging no grounds for reversal, and asking this court to independently review the record for error.  To assist the court in its review under *Anders*, 386 U.S. at pp. 744-745, counsel identified one issue she considered in evaluating the potential merits of this appeal: "whether the trial court improperly excluded evidence of prior false accusations of child molestation."  The court properly excluded this evidence as inadmissible hearsay; regardless, any error was harmless on this record.

We reviewed the entire record as required by *Wende* and *Anders* and discovered no arguable issues for reversal on appeal.  Competent counsel has represented Rivas on this appeal.

### III.

We affirm the judgment.

CASTILLO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DO, J.